**STATE of Missouri, Respondent,**

v.

**Elton J. NORFOLK, Appellant.**

No. SC 92252.

Supreme Court of Missouri,
En Banc.

June 12, 2012.

Timothy J. Forneris, Public Defender's Office, St. Louis, for Norfolk.

John M. Reeves, Attorney General's Office, Jefferson City, for State.

Talmage E. Newton IV, Pleban & Petruska Law LLC, St. Louis, Burton H. Shostak, Shostak Law LLC, Clayton, for The Missouri Association of Criminal Defense Lawyers and the National Association of Criminal Defense Lawyers, which submitted a brief as a friend of the Court.

ZEL M. FISCHER, Judge.

Elton Norfolk appeals from the circuit court's judgment finding him guilty after a bench trial of one count of unlawfully carrying a concealed weapon, § 571.030,[1] and one count of possession of marijuana, § 195.202. The circuit court sentenced Norfolk to concurrent terms of three

1. All statutory references are to RSMo 2000 unless otherwise indicated.

years' in prison for unlawfully carrying a concealed weapon and one year in jail for the possession of marijuana and suspended execution of his sentences. Norfolk was placed on probation for three years to be supervised by the Missouri Board of Probation and Parole on the concealed weapon charge, and was placed on unsupervised probation for one year on the possession of marijuana charge. Norfolk argues on appeal that the circuit court clearly erred in overruling his motion to suppress evidence and his objections to the admission of evidence seized because the police officer lacked reasonable suspicion to stop him and check for a weapon.

Officer Reynolds was on routine patrol in a marked police car near the 3900 block of Lexington and Vandeventer in the city of St. Louis. She was patrolling that particular area because there had been several armed robberies there in the recent past. While traveling southbound on Vandeventer, Officer Reynolds observed a male, later identified as Norfolk, standing alone on the corner. Officer Reynolds made eye contact with Norfolk, after which he adjusted his pants in a manner that led her to believe he was concealing a weapon. After observing this action, which she described as reaching around to his back with a single hand, Officer Reynolds turned her patrol car around and parked in front of a convenience store.

As Officer Reynolds exited the vehicle, Norfolk walked into the store. She followed Norfolk into the store, approached him, and asked, "Will you come outside and speak with me?" to which Norfolk replied, "F--- you. I don't need to speak to you." Officer Reynolds told Norfolk, "If you're not doing anything wrong, then you'll come outside and you'll speak to me." They both exited the store. Officer Reynolds told Norfolk to turn around and place his hands on the wall of the store so that she could check him for weapons; Norfolk complied. When his shirt came up and the butt of a gun became visible, Officer Reynolds put her hand against the back of Norfolk's head and called for assistance. Norfolk was arrested. While conducting a search incident to arrest, Officer Reynolds retrieved the gun she saw in Norfolk's waistband and the marijuana from his pocket.

Norfolk was charged with one count of unlawful use of a weapon,[2] one count of possession of under 35 grams of marijuana, and third-degree assault of a law enforcement officer.[3] Norfolk filed a motion to suppress all of the items seized, arguing the search was unlawful because it was conducted pursuant to an illegal stop. After an evidentiary hearing, the circuit court overruled Norfolk's motion to suppress.

Norfolk waived his right to a jury trial; therefore, the case proceeded to bench trial. Norfolk testified Officer Reynolds approached him while he was inside the convenience store, had a taser gun in her hand, and ordered him to go outside and stand up against the wall for a search. Norfolk admitted during cross-examination by the State that he possessed the gun and the marijuana that were seized. The cir-

---

**2.** Officer Reynolds testified she initially thought Norfolk was 17 to 18 years old, and § 571.101 at the time did not allow a person to obtain a permit to carry a concealed weapon unless the person was 23 years old. Section 571.101, RSMo Supp.2010. The statute has since been amended to reduce the age to obtain a carry conceal permit to 21 years old.

It was proven that Norfolk did not have a permit to carry a concealed weapon.

**3.** Norfolk was acquitted on the assault charge. The evidence adduced relating to that charge has been omitted from discussion because it is not relevant to the issues on appeal.

cuit court found Norfolk guilty of unlawful use of a weapon in that he was carrying the gun in a concealed manner and of possession of marijuana. Norfolk argues the circuit court clearly erred in overruling his motion to suppress and overruling his objections to the admission of evidence seized during the search because Officer Reynolds lacked reasonable suspicion to conduct a *Terry Stop and Frisk*. Norfolk further claims any evidence obtained during the *Terry Stop and Frisk* was seized in violation of his Fourth Amendment rights and should be excluded from evidence pursuant to the fruit of the poisonous tree doctrine. Without that evidence, Norfolk claims there was insufficient evidence to support the convictions.

■ As a general rule, "all evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in state court." *State v. Grayson*, 336 S.W.3d 138, 146 (Mo. banc 2011) (*Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). The exclusionary rule also requires excluding the " 'fruit of the poisonous tree,' that is, 'evidence discovered and later found to be derivative of a Fourth Amendment violation.' " *Grayson*, 336 S.W.3d at 147 (*State v. Miller*, 894 S.W.2d 649, 654 (Mo. banc 1995)).

The State argues Officer Reynolds had reasonable suspicion to believe criminal activity was afoot; therefore, the *Terry Stop and Frisk* for a weapons check was warranted, and the gun and marijuana were appropriately received as evidence.[4]

## Standard of Review

■ In reviewing a trial court's ruling on a motion to suppress, there must be "substantial evidence" to support the ruling. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). "[T]he facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001) (citing *State v. Kinkead*, 983 S.W.2d 518, 519 (Mo. banc 1998)).

In "reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses." *Rousan*, 961 S.W.2d at 845. This Court gives deference to the trial court's factual findings but reviews questions of law *de novo*. *Id.*

*State v. Gaw*, 285 S.W.3d 318, 319–20 (Mo. banc 2009).

## Facts

Officer Reynolds testified at the suppression hearing and the trial regarding the basis of her reason to suspect Norfolk was carrying a concealed weapon unlawfully. The testimony on which the circuit court may have relied to determine the officer's conduct was permissible included the following:

---

4. The State additionally argues that, even if the evidence was erroneously admitted, Norfolk suffered no prejudice by the admission of this evidence because there was overwhelming evidence of his guilt. Specifically, the State cites Officer Reynolds' testimony regarding the items she seized during the search and Norfolk's admission on cross-examination that he possessed the items seized. Norfolk disagrees, arguing were it not for Officer Reynolds illegal search, she could not have witnessed or testified about the seized items.

## Motion to Suppress Hearing

### Direct Examination

Q  Did you have occasion to be in the 3900 block of Lexington around 9:00 p.m. that night?

A  I was.

Q  What was that?  Why were you there?

A  The area we were paying attention to closely, we had several robberies, armed robberies in that area.  So they—our supervisors had us patrolling that area very heavily due to the crimes in the past.

Q  Okay.  What kind of robberies are we talking?

A  We're talking armed robberies. We're talking holdups.

Q  Okay.  All right.  So you're on a robbery detail, I guess, and around 9 p.m. does anything eventually draw your attention?

A  It does.  I'm traveling south on Vandeventer passing Lexington. I see a black male standing on the corner, which at the time, we made eye contact. This individual adjusted his pants in a manner which I believed he was concealing a weapon.

Q  All right.  I'm going to stop you. Were you in a marked patrol car?

A  I was.

Q  All right.  So it looked to you like he recognized you as the police?

A  He did.

Q  All right.  And you say he touched his waistband in a manner that led you to believe he was concealing a weapon?

A  He did.

Q  Can you describe that for me? Why did you believe he was concealing a weapon?

A  In the past of every weapons arrest I've been assisting or been on, a lot of individuals that carry weapons happen to adjust the weapon for some reason when the police come.  I don't know if it's a subconscious thing they check it. So I believe the way he adjusted his pants was not in a manner to pull his pants up, as if he was checking to see if a weapon or the item that he had was still there.

Q  All right.  So it didn't look to you like he was adjusting his clothing.  It looked to you like he was checking to make sure whatever he had concealed was still there.

A  Correct.

Q  And have you—you've seen that before?

A  I have.

### Cross–Examination

Q  Now, you said that the individual grabbed at his pants, correct?

A  Yes.

Q  And can you describe how that's different from someone who is pulling up their pants?

A  When individuals—I guess the quote, the saying is "sag"—their pants don't sit at their waist properly.  When they adjust their pants, they adjust in the front.  They don't adjust in the back.  That's what I commonly see.

Q  So at the top of his pants, when you said that he grabbed at the top of his pants—

A  In the back area, yes.

Q  In the back area.

A  Yes.

Q  Pulling up his pants?

A  Well, when they adjust their pants, they use two hands to pull their pants up.

## Redirect Examination

Q All right. Now, when you first saw him touch his waistband, what exactly did you believe he was doing?

A Adjusting the gun.

Q All right. So you thought he had a gun?

A Correct.

Q So that's why you then checked him for weapons?

A Correct.

Q Were you afraid for your safety at that point?

A I was, yes.

## Bench Trial

### Direct Examination

We were in the area doing robberies.

\* \* \*

There was a black male standing on the corner that drew my attention.

Q Okay. And what about the man standing on the corner drew your attention?

A I was passing the gentleman. I observed him grab his waistband in a manner which I believed he was concealing a weapon.

### Redirect Examination

Q Now, you initially thought he had a gun because of the way he adjusted his waistband when you first saw him, right?

A Correct.

Q When you took him out of the store, you saw the gun after his shirt came up, right?

A Correct. Yes.

\* \* \*

Q Did it turn out that the defendant eventually had a concealed and carry permit?

A No, he did not.

## Analysis

■ The Fourth Amendment to the United States Constitution preserves the right of citizens to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Generally, a search or seizure is only permissible if there is probable cause to believe a person has committed or is committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). For Fourth Amendment purposes, a "seizure" occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16, 88 S.Ct. 1868. In other words, "[a] seizure occurs when the totality of the circumstances surrounding the incident indicates that 'a reasonable person would have believed that he was not free to leave.'" *State v. Sund,* 215 S.W.3d 719, at 723 (Mo. banc 2007).

■ As a general rule, warrantless seizures are unreasonable and unconstitutional. *State v. Pike,* 162 S.W.3d 464, 472 (Mo. banc 2005). However, the United States Supreme Court has held that the Fourth Amendment allows a brief investigative detention if the officer has a reasonable suspicion, based on specific and articulable facts, that illegal activity has occurred or is occurring. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *Pike,* 162 S.W.3d at 472. In determining whether the seizure and search were unreasonable, a court must determine "whether the officer's ac-

tion was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. "In evaluating reasonable suspicion, courts must 'determine if the content of the information possessed by the police and its degree of reliability is sufficient to create a 'reasonable suspicion' of criminal activity.'" *State v. Grayson*, 336 S.W.3d 138, 143 (Mo. banc 2011) (*State v. Berry*, 54 S.W.3d 668, 673 (Mo.App.2001)). "[W]e are mindful that police officers are permitted to make use of all of the information available to them" when forming a particularized and objective basis for suspecting criminal activity. *State v. Johnson*, 316 S.W.3d 390, 396 (Mo.App.2010). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *State v. Hawkins*, 137 S.W.3d 549, 558–59 (Mo.App.2004) (*United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). Whether the facts as found by the circuit court amount to reasonable suspicion is a question of law that this Court reviews *de novo*. *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004).

Officer Reynolds articulated a reasonable suspicion that criminal activity was afoot when she performed the *Terry Stop and Frisk* of Norfolk. Officer Reynolds testified that Mr. Norfolk made eye contact with her when she drove by him in a marked police car while she was routinely patrolling an area where there had been several recent armed robberies. Officer Reynolds then saw Mr. Norfolk make a furtive movement that her experience and training reasonably caused her to believe was the illegal concealment of a weapon.

Based on the totality of these circumstances, reviewed in the light most favorable to the circuit court's ruling, this Court determines there was sufficient evidence to support the finding of the circuit court.

### Conclusion

Therefore, Norfolk's Fourth Amendment rights were not violated, the evidence seized was properly admitted, there was sufficient evidence to support the convictions, and the judgment is affirmed.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, STITH and PRICE, JJ., and BEETEM, Sp.J., concur.

DRAPER, J., not participating.