**STATE of Missouri, Plaintiff–
Respondent,**

**v.**

**Ricky E. FLOWERS, Defendant–
Appellant.**

**No. SD 32073.**

Missouri Court of Appeals,
Southern District,
Division Two.

June 18, 2013.

Samuel E. Buffaloe, Columbia, MO, for Appellant.

Andrew C. Hooper, Jefferson City, MO., for Respondent.

## DON. E. BURRELL, J.

A jury returned guilty verdicts against Ricky E. Flowers ("Defendant") on the charges of possession of drug paraphernalia with intent to use and possession of methamphetamine, a controlled substance. *See* sections 195.202 and 195.233.[1] The trial court entered judgment accordingly and sentenced Defendant to concurrent, three-year terms on each offense.

Defendant contends the trial court erred in denying his motion to suppress and subsequently admitting evidence at trial that the police found on Defendant's person and inside his duffel bag because: (1) the officer who stopped him lacked reasonable suspicion to do so; and (2) the officer lacked "a reasonable particularized suspicion that [Defendant] was armed at the time" he frisked Defendant a second time because the officer did not feel anything "such as a weapon during the first frisk[.]"

Finding merit in Defendant's first point, we reverse his convictions and remand the case for further proceedings consistent with this opinion.[2]

## Applicable Principles of Review and Governing Law

■■■ "Where, as here, a motion to suppress was overruled and the evidence was introduced at trial, an appellate court will consider the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. Goff,* 129 S.W.3d 857, 861–62 (Mo. banc 2004).

Whether reasonable suspicion existed is a question of law we review *de novo. Id.* at 862; *see also Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In deciding that legal issue, we defer "to the trial court's determination of credibility and factual findings" and will only reverse as to those matters for clear error. *Goff,* 129 S.W.3d at 862. "At a suppression hearing the [S]tate bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." *State v. Franklin,* 841 S.W.2d 639, 644 (Mo. banc 1992).

■■■ Missouri citizens are protected from unreasonable searches and seizures under both the United States and Missouri constitutions, and "the same analysis applies to cases under" both authorities. *State v. Pike,* 162 S.W.3d 464, 472 (Mo. banc 2005); U.S. Const. amends. IV and XIV sec. 1; Mo. Const. art. I, sec. 15. Evidence obtained in violation of this protection is excluded from evidence in state court. *State v. Grayson,* 336 S.W.3d 138, 146 (Mo. banc 2011).

■■■ "[S]ubject to only a few specific and well-delineated exceptions, warrantless searches and seizures conducted without probable cause are deemed *per se* unreasonable." *State v. Smith,* 373 S.W.3d 502, 505 (Mo.App. S.D.2012). One such exception is that an officer may stop a person without a warrant to conduct "a brief investigative detention if the officer has a reasonable suspicion, based on specific and articulable facts, that illegal activity has occurred or is occurring." *State v.*

---

1. The case was heard in Oregon County after a change of venue from Howell County. All statutory references are to RSMo 2000.

2. Our disposition of Point I in favor of Defendant renders his second point moot.

*Norfolk,* 366 S.W.3d 528, 533 (Mo. banc 2012) (citing *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

 "An anonymous tip by itself seldom, if ever, provides reasonable suspicion that a person has committed a crime warranting a Terry-stop." *State v. Weddle,* 18 S.W.3d 389, 393 (Mo.App. E.D. 2000). "[I]n general ... a detention and search and seizure is unlawful if conducted solely on the basis of an anonymous tip[.]" *State v. Deck,* 994 S.W.2d 527, 536 (Mo. banc 1999); *see also Florida v. J.L.,* 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (holding that an anonymous tip, without corroboration of criminal activity, was an insufficient basis on which to stop and frisk an individual). "[R]easonable suspicion can be established if [the officers involved in the stop] independently observed sufficient corroborating information from [a] prior police communication." *State v. Miller,* 894 S.W.2d 649, 653 (Mo. banc 1995). Thus, "if the police corroborate the anonymous tip it may exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *State v. Berry,* 54 S.W.3d 668, 673 (Mo.App. E.D.2001) (quoting *Alabama v. White,* 496 U.S. 325, 327, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

### Facts and Procedural Background

The trial court overruled Defendant's motion to suppress after an evidentiary hearing held in December 2011. The jury trial was held on January 23, 2012. Because Defendant does not challenge the sufficiency of the evidence admitted at trial to support his convictions, our focus is on the evidence relevant to our resolution of the search and seizure issue. That evidence, taken from both proceedings and viewed in the light most favorable to the trial court's denial of Defendant's motion to suppress, *see Goff,* 129 S.W.3d at 862, established the following facts.

Jared Peterman, a captain in the Howell County Sheriff's Department, was directed to a specific mobile home lot by a dispatch report that "a subject by the name of [Defendant] was making threats to assault another male and to do damage to a vehicle." Deputy Rodney Harper also responded to the call. Deputy Harper went to the front door of the residence, and Captain Peterman approached the residence from the back.

Captain Peterman observed Defendant "sitting on the steps to a deck leading to the back door," "talking [on] a cell phone[.]" At that point, Captain Peterman did not know Defendant's identity. As Captain Peterman approached Defendant, he saw a black duffel bag and three to five trash bags sitting next to Defendant on the deck. Captain Peterman did not see inside any of the bags at that time. Defendant identified himself and said that he "and his girlfriend had got into an argument" and he was just "calling for a ride for him[self] and his belongings." Captain Peterman did not observe anyone else in the vicinity. Defendant was not seen "tampering with or damaging any vehicles[,]" he was not making any threats, and there was no "sign of those activities[.]"

While Captain Peterman was approaching Defendant at the back of the residence, Deputy Harper was being let inside the front door by Barbara Plowick. While Deputy Harper was speaking with Ms. Plowick, he observed a "metal spoon" with "a little white substance" on the bar in the kitchen area. Deputy Harper testified that "as I had noticed that, we made eye contact that I noticed that and she noticed that I noticed that." Deputy Harper glanced out the kitchen window as Captain Peterman went by "with a male subject[,]"

and he went outside to briefly join them. As he left the residence, he "heard the clank of the stick falling down" behind the sliding door, and he realized that the door had been "locked" behind him.

Captain Peterman had "asked [Defendant] to step around to the front of the residence" because that was where Deputy Harper was, and Defendant complied. Captain Peterman testified that when he asked Defendant to accompany him, Defendant was not free to leave.

After reaching the front of the residence, Captain Peterman "instructed [Defendant] to place his hands on Deputy Harper's patrol car[.]" Captain Peterman "pat[ted] down or frisk[ed]" Defendant because he had observed Defendant put his hands in his pockets twice after being instructed not to do so. Captain Peterman regarded this frisk as "a non-consensual search[.]" Captain Peterman did not feel any weapons during the frisk, and he did not "identify any particular object[.]" Captain Peterman asked Defendant "if he knew what contents he had in his pocket." Defendant "reached down and shuffled the items around[,]" and Captain Peterman felt the exterior of Defendant's pocket a second time. This time, Captain Peterman felt what he thought was a syringe.

Defendant told Captain Peterman "that [he] could not remove the items from his pocket unless he was under arrest[.]" At that point, Captain Peterman told Defendant that he was under arrest, handcuffed him, and "placed [him] in Deputy Harper's patrol vehicle." After he had completed those tasks, Officer Harper approached Captain Peterman and told him that that he had seen a spoon with some residue on it while he was inside the residence. Because he had heard the front door "lock" behind him, Deputy Harper went around back to approach the residence from the rear. In that process, he looked through a window and observed Ms. Plowick washing the spoon.

Captain Peterman also returned to the back of the residence to investigate "[b]oth" the dispatched assault allegation and the possibility of drug activity. During this second visit to that location, Captain Peterman saw for the first time "a glass smoking device and a metal smoking device" lying "on the ground underneath the steps, where [Defendant] had been seated[,]" along with "a plastic bag of a green, leafy substance[.]" [3]

Captain Peterman then observed that the duffel bag on the deck was open. Without opening it further, he was able to observe a syringe, coffee filters, and "a metal spoon ... with residue on it[.]" Those items were significant to him because he "had reason to believe that those items were used in illegal street drug use, usually methamphetamine." Captain Peterman photographed the items and searched the duffel bag. Defense counsel timely objected to Captain Peterman's testimony about the contents of the duffel bag based upon the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 10, 15, and 18(a) of the Missouri Constitution.

**3.** Captain Peterman's testimony regarding the details of the pat-down search, the discovery of the syringe in Defendant's pocket, and the observation of the items under the steps took place only during the suppression hearing, so it was not presented to the jury. In the prosecutor's opening statement at trial, he told the jury that Captain Peterman "walk[ed] back to the back deck and he sees—laying [sic] down on the ground by the steps, he sees what he thinks is marijuana and paraphernalia and some pipes." Upon Defendant's objection, the trial court instructed the jury that "Defendant in this particular case is not charged with possession of marijuana. So any comment that [the prosecutor] may have made with regard to marijuana you are to disregard. Okay?" Defendant does not challenge the efficacy of that remedy in this appeal.

Captain Peterman's search of the duffel bag produced other items that included another syringe, "a large plastic bag that had a milky liquid ... [with] a strong flammable odor[,]" "another plastic bag" with liquid and "a flammable odor to it," "two pill bottles that were prescribed to [Defendant,]" plastic bags, a box of latex gloves, "a metal grinder that had residue on it," "digital scales with residue, a glass plate, a razorblade, a wallet that had [Defendant's] identification in it[,]" and a homemade funnel.[4] At the suppression hearing, Captain Peterman testified that it was his understanding that the duffel bag belonged to Defendant.

Ms. Plowick eventually consented to a search of the residence. That search produced another spoon bearing a "white powdery residue" that was found in a bathroom. A tin can with similar residue was recovered from another bathroom.

After the jury returned its guilty verdicts, Defendant filed a motion for new trial that included his contention that it was error to overrule the suppression motion and Defendant's trial objection because "the contents of [Defendant's] bags, seized from the back porch of Ms. Plowick's residence[,]" "w[ere] the fruit of an unlawful search and seizure[.]" The trial court denied the motion for new trial and sentenced Defendant as previously noted. This appeal timely followed.[5]

## Analysis

### *The Seizure of Defendant was Unreasonable*

■ Defendant's first point contends Captain Peterman lacked sufficient reason-

able suspicion to stop Defendant based upon the dispatch information he had received "because when Captain Peterman first observed [Defendant], [Defendant] was standing alone outside on a deck talking on the phone, and Captain Peterman was thus unable to corroborate the tip coming from an unknown source that [Defendant] was threatening to assault another male and to do damage to a vehicle." With the exception of Defendant's "thus," we agree.

Defendant claims that because the record does not reveal who provided the information that Defendant had threatened to assault a man and damage a vehicle, that information, by itself, cannot be treated as sufficient to provide reasonable suspicion, citing *Franklin*, 841 S.W.2d at 645 (holding evidence from a stop inadmissible when no showing was made that the officer "independently observed behavior" corroborating dispatch information and the record was silent as to its source).

The State agrees that the dispatch information should be treated as having "been anonymously placed" and that corroboration was thereby required for purposes of establishing reasonable suspicion. *Cf. J.L.*, 529 U.S. at 272, 120 S.Ct. 1375; *Deck*, 994 S.W.2d at 536. And while the State correctly notes that Captain Peterman was able to corroborate that the person identified in the dispatch information was at the stated location, that verification of identity was only one of the two types of corroboration needed.

An accurate description of a subject's readily observable location and appear-

---

4. Samples from the two bags of liquid seized from the duffel bag later tested positive for the presence of methamphetamine.

5. Although the record is not entirely clear as to whether Defendant was granted a continu-

ing objection on constitutional grounds to the admission of the evidence challenged in this appeal, the State does not dispute Defendant's claim that the matter has been properly preserved for appellate review.

ance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

*J.L.,* 529 U.S. at 272, 120 S.Ct. 1375; *see also State v. Bergmann,* 113 S.W.3d 284, 286–87 (Mo.App. E.D.2003) (vehicle stopped by officer was similar to that reported in anonymous call of a disturbance and was traveling in the area specified by the caller, but "the stop was illegal and the evidence seized ... should have been suppressed" because the officer "observed nothing to corroborate that the person driving that car had been involved in criminal activity").

Regarding the necessary verification of criminal activity, the State contends that Defendant's "statement that he had just been in an argument with his girlfriend confirmed that a domestic disturbance had taken place" such that Defendant's detention while the officers "investigated further" was justified. We disagree.

The State offers no authority supporting its claim that Defendant's statement about arguing with his girlfriend corroborated

the criminal activity asserted in the anonymous tip—that Defendant was at that location "making threats to assault another male and to do damage to a vehicle." Even if we were to assume, *arguendo,* that the argument concerned another male, such an argument would not have indicated that "illegal activity has occurred or is occurring." *Norfolk,* 366 S.W.3d at 533.

■■■ Captain Peterman admitted that he saw no "sign" of Defendant threatening to assault a man or damage a vehicle. And at the time he made his decision that Defendant was not free to leave, he was not yet aware of any evidence indicating that a completely different kind of criminal activity—drug activity—was afoot. Thus, Defendant was seized in violation of his constitutional rights because he was seized without a warrant and without a reasonable suspicion based on specific, articulable facts that criminal activity was occurring or had occurred.[6]

### The Remedy

■■ Defendant contends that "[b]ecause this unconstitutional stop led to the discovery of the paraphernalia and the methamphetamine at issue in the present case, this evidence should have been suppressed at trial[,]" citing *Grayson,* 336 S.W.3d at 151. For its part, the State does not challenge the applicability of the exclusionary rule as the appropriate remedy, conceding in its brief that "[i]f the investigatory stop is not justified by reasonable suspicion, or if the officer exceeds the proper scope of the stop, then any evidence derived from the stop is inadmis-

**6.** Defendant also argues that "Captain Peterman should have never approached [Defendant] after seeing that he was not threatening anyone." That is an unsupportable expansion of the prohibition. A police officer may engage an individual in consensual conversation. "Consensual encounters do not impli-

cate the Fourth Amendment unless and until the officer, by physical force or show of authority, restrains the person's liberty so that a reasonable person would not feel free to decline the officer's requests or terminate the encounter." *State v. Daniels,* 221 S.W.3d 438, 442 (Mo.App. S.D.2007).

sible at trial[,]" citing *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In addition to that concession, the State does not argue that any of the recognized exceptions to the exclusionary rule are applicable under the facts of this case to Defendant's first point. *See, e.g., Miller,* 894 S.W.2d at 654 and n. 5 (discussing attenuation, the independent source rule, and the inevitable discovery rule as acknowledged exceptions to the general rule that any evidence derived from an invalid stop is inadmissible at trial). But because "we are to affirm the trial court's denial of the appellant's motion to suppress on any ground supported by the record," *State v. Ramires,* 152 S.W.3d 385, 391 (Mo.App. W.D.2004), we have examined the record to determine whether it would support an admission of the challenged evidence based on the applicability of a recognized exception to the exclusionary rule. That review has failed to convince us that any such exception applies.

Point I is granted. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

JEFFREY W. BATES and MARY W. SHEFFIELD, JJ., concur.